Filed 3/5/13  P. v. Botello CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PATRICK JOSEPH BOTELLO, JR.,<br><br>    Defendant and Appellant. | A128822<br><br>(Contra Costa County<br>Super. Ct. No. 05-0807883) |

Patrick Joseph Botello, Jr. appeals from his conviction, following a jury trial, for second degree murder, attempted murder, discharging a firearm at an inhabited dwelling, and active participation in a criminal street gang—including true findings on various sentencing allegations for gang involvement and firearm use and discharge.

Botello challenges his convictions, alleging various instructional errors; abuse of the trial court's discretion in allowing a gang expert to briefly describe a prior "bad act"; insufficiency of the evidence in support of the gang involvement allegations; insufficiency of the evidence in support of one of the firearm use and discharge allegations; and ineffective assistance of counsel.

Botello also challenges his sentence, contending that a 10-year consecutive term for the gang involvement allegation was invalid; that the fines imposed for restitution and parole revocation restitution exceeded the statutory maximum allowed; and that the trial court failed, as required by statute, to determine his ability to pay before imposing a probation report fee.

We conclude that Botello's assertions of error during trial are without merit, except for two instructional errors which were not prejudicial. Accordingly, we affirm Botello's convictions and the true findings on the sentencing allegations.

All of Botello's challenges to his sentence have merit and, with the exception of the challenge to the probation report fee, are unopposed by the People. We reverse Botello's sentence and remand to the trial court for a resentencing hearing.

## BACKGROUND

### I. *Procedural Background*

On July 1, 2008, the Contra Costa County Grand Jury returned an indictment accusing Botello and Robert Miles of crimes arising from three separate incidents. With respect to an incident on August 1, 2007, the grand jury accused Botello and Miles of the murder of Dominic Porter, in violation of Penal Code[1] section 187 (count 1); of the deliberate and premeditated attempted murder of Marquez Pierce, in violation of sections 187, subdivision (a), and 664, subdivision (a) (count 2); of discharging a firearm at an inhabited dwelling, in violation of section 246 (count 3); and of active participation in a criminal street gang, in violation of section 186.22, subdivision (a) (count 4). Counts 1 through 3 were accompanied by gang allegations (§ 186.22, subd. (b)(1)) and various firearm use and discharge allegations (§ 12022.53, subds. (b)-(d), (e)(1)). In addition, Miles alone was charged with possession of ammunition by a convicted person, a violation of section 12316, subdivision (b)(1) (count 11).

Botello and Miles pled not guilty to the charges and denied the sentencing allegations. Before trial, the court severed the charges according to the separate incidents and ordered that the trial on the charges arising from the August 1 incident take place first. For the trial, count 11 was renumbered count 5.

The case came to trial before a jury on February 3, 2010. The jury began deliberation on March 16, 2010, in the afternoon, deliberating the rest of that day and on March 18, 19, 22, 23 and 24, returning verdicts late in the morning of the 24th. Botello

---

[1] Unless otherwise indicated, subsequent code references are to the Penal Code.

was convicted on all four counts, with the jury finding true all sentencing allegations, except for the allegation that the attempted murder was deliberate and premeditated. Miles was convicted on count 5, for possession of ammunition, but was acquitted on all other counts.

On June 4, 2010, the court sentenced Botello to a total term of 50 years to life as follows: (1) 15 years to life for the murder; (2) a consecutive sentence of 25 years for personally using a firearm and causing death (§ 12022.53, subd. (d)); and (3) a consecutive sentence of 10 years for the street gang allegation (§ 186.22, subd. (b)(1)). The court imposed concurrent sentences for the attempted murder and sentencing enhancements: (1) 9 years for the attempted murder; (2) 25 years for personally using a firearm and causing great bodily injury; and (3) 10 years for the street gang allegation. Sentences for the other three sentencing allegations related to the murder and attempted murder convictions were stayed. Sentences for shooting at an inhabited dwelling and active participation in a criminal street gang (counts 3 and 4) were imposed, but were stayed under section 654.

Among other fines and fees, the court imposed a restitution fine of $100,000 and suspended a parole revocation restitution fine in the same amount.

Botello filed a timely notice of appeal.

## II. *Gang Background*

The People's gang expert, Sergeant Jeff Palmieri of the San Pablo Police Department, testified that the Norteño gang is associated with "Nuestra Familia"—an organized crime syndicate within the prison system. Norteños frequently wear red colored clothing, including San Francisco 49er football jerseys. Norteños also employ the number 14 as an identifier, because "N" is the 14th letter of the alphabet. The primary activities of the Norteños include the sale of narcotics, possession of firearms, and assaults with firearms.

The Norteños are at war with the Sureños, a rival gang, whose color is blue. Norteños refer to Sureños as "scraps" and, when writing, often strike through the letter "s" as a sign of disrespect to Sureños.

3

**III.** *The Events at the Zoe Court Party*

A birthday party for Michael Polries and a going-away party for Ross Batchelder (Ross), who was being deployed in the military, was held at the residence of Lamar James (Lamar) and his father, at 274 Zoe Court in Pinole, California, on the night of July 31, 2007, and the early morning of August 1. Zoe Court, a dead-end street, runs on a downhill slope to Orleans Drive, the only street with which it intersects. The house at 274 Zoe Court is approximately in the middle of the block. The number of people attending was variously estimated by attendees as more than 20 and approximately 32.

Several people from Vacaville attended the party, including Lamar's brother, Ladarian James (Ladarian); Terrie Cofield; Cofield's cousin, Dominic Porter, the victim of the murder count; and Marquez Pierce, the victim of the attempted murder count. Also attending were people from other towns and cities, including Polries's cousins Joey Bonnett (Bonnett) and Raymond Villarreal; Villareal's friend, Andrew Apodaca; and Ross's sister, Olivia Batchelder (Olivia).

Kenneth Salguera drove to the party, bringing Miles, Harold Arrolinga, and two other people.

Jessie Mae Armas testified that she dropped Olivia off at the party before proceeding to a park. She had four people with her in the car: Analee Cooper, Thomas Burk, Botello, and Juan Carlos de los Santos (Santos). At trial, Burk denied being at the party.

Armas testified that Botello called Olivia and asked if he and the others with Armas could go to the party. Armas believed that Olivia did not want them to come. However, Botello said it was okay to go and Armas drove them all to the party.

Polries testified at trial to having little memory of the party because he was drunk, but in an interview with police that was played for the jury, Polries said that a fat guy with long hair showed up at the party. After saying that he didn't know the person's name and could be killed for saying it, Polries said he was "J.B." and identified the person as Botello in a photo lineup. He knew Botello was Norteño because Botello didn't hide it and commonly wore red. When Olivia told Polries that Botello was on the

4

phone and wanted to come, Polries said he didn't want him there. Olivia said okay, but five minutes later Botello was at the party.

**A.** *What Botello Wore*

Cofield said that Botello was wearing a red football jersey. On cross examination, she said it had some red in it, but she wasn't sure how much of it was red. She believed he also wore a red hat, but was not sure.

Villarreal said Botello wore a white baseball jersey. Bonnett, Salguera, and Cooper could not remember what Botello wore.

Pierce testified that he saw no one wearing red, but in a prior statement to police had described a person, who seemed to be reaching for a gun, as wearing a white jersey with red lettering and numbering.

**B.** *Botello's Argument in the Backyard*

Botello had an argument with an African-American male at the party. Salguera described the argument in greatest detail. A slim, young African-American man walked between Salguera and Botello, bumping both of them, while they were in the backyard. The man put his hand on Salguera to give himself extra room, a gesture that did not strike Salguera as rude, but Botello told the man to mind his manners. The man "took it like, what—what the hell you talking about." He and Botello stared at each other and Botello wanted an apology, challenging the man to a fight when one was not offered. The man did not want to fight Botello and said, "People don't fight with hands no more. We fight with guns." Botello replied, "I don't need a gun to beat your ass." Salguera said that at this point, a small African-American girl became involved, arguing with another girl. The African-American girl told everybody, "You guys need to leave, get out of my house."

Cofield identified the man with whom Botello argued as her friend Ladarian, but she did not see the argument's beginning. She said that Botello and Ladarian were arguing about somebody bumping into somebody and not saying excuse me. Cofield told Botello to leave.

Cooper testified that she was in the bathroom with Olivia when the argument began and that both of them were drunk. She said that, when she came out, Botello was arguing with African-Americans, possibly including a female, whom she did not know. Cooper was not sure what was said, but thought that somebody had bumped into someone else.

Armas said that the argument occurred after Botello and "some black guy" bumped into each other. Botello said that he could fight the man one-on-one and one of the African-Americans mentioned guns.

Pierce did not testify to the argument between African-Americans and Botello, but had told a police officer that he saw an argument outside about 20 minutes before the shooting. He said that a group of Hispanics was arguing with someone at the party, but he did not know who, and that this argument broke up without violence.

In an interview with police that was played to the jury, Apodaca told of a quarrel between "two black guys and a Mexican guy." After first saying that he didn't know the man's name, Apodaca identified him as Botello, whom he described as five-five or five-six and about 200 pounds. Botello and the African-American males were about to fight and one of the African-American males "was like oh, people don't fight no more. . . ." They were talking about going to get guns. Botello "was like all right, bring your things. He was like I got something for you too. He was like I'll be here. . . ."

In his interview with police, Polries said that Botello was arguing with an African-American male at the back door. Botello was cursing and screaming because an African-American male had touched shoulders with him. The African-American male was apologizing; Polries and several others were telling Botello to leave. Botello said okay, he didn't have a gun, and he just wanted to talk to the other person.

## C. *African-American Men Leave and the Argument Continues*

According to Salguera, the African-American left with other African-American men and said he would be back. Two females, one of whom was the African-American who had told everyone to leave, were arguing in front of the house, the argument having moved there.

Cofield said that Porter and Ladarian left the party, but she did not see how and was not paying attention to cars coming and going. She was not sure if Pierce left with them. A girl, who looked Hispanic and had been standing next to Botello, began arguing with her. The argument moved to the area in front of the house as the people inside went outside toward the front.

Cooper said that the African-American men with whom Botello had been arguing left in a car, though on cross-examination she indicated that she did not see them get into a car. She went to the front yard and a number of people were there, including Botello, Olivia, Bonnett, Apodaca, and Salguera. She saw Armas arguing with a group of females, some of whom were African-American.

Armas testified that she argued with "a young black girl" for a few minutes in the driveway in front of the house. She claimed not to remember what the argument was about and did not know where Botello was at the time.

Bonnett became aware of an argument involving Botello, African-Americans, Olivia, and other girls when he was in the backyard. Olivia was arguing with an African-American girl who was "telling us we had to go." Olivia was trying to tell her "it was all good." Bonnett told Olivia, Apodaca, and Villarreal that they should leave. When he went to the front yard, there was no physical argument, but African-American girls were yelling for everyone to leave, and everyone seemed to be leaving.

Villarreal remembered an argument during which an African-American girl was yelling. As she was telling Botello to leave, Villarreal decided he should leave as well. Villarreal woke up Apodaca, who had passed out in the backyard, and walked with him into the front yard, where there was no physical fighting, only yelling and arguing. Apodaca testified similarly.

In his interview with police, Polries said that somehow the argument got to the front yard after Polries thought "they" had gone. As Polries was in the backyard, someone told him of an argument in the middle of the street. Polries walked out to look and saw people against the garage and people in front of the house arguing with Botello. Nearly the entire party was there. Botello was standing in the street near the driveway

and/or on the sidewalk in front of the house. The girls with Botello were cursing at other girls. Botello and a "fat friend" were cursing, trying to take on the whole party.

**D.** *The African-American Men Return and One Threatens Botello with a Gun*

Salguera testified that the African-American males returned in a car while he, Miles, and two others were walking towards Salguera's truck. Salguera saw the car pulling up, but did not pay attention to the people who got out. He did not see Botello involved in a conflict in front of the house.

Cofield said that Ladarian and Porter walked back into the house when they returned to the party. Then they went outside, and Porter was standing with Cofield as she continued to argue. She saw no one holding a gun and heard no one threaten Botello.

Cooper said that as she was standing in front of the house, a big, older, four-door car stopped in the middle of the street and three or four African-American men jumped out. The car then drove to the end of the street and turned around. One of the men who jumped out ran up to Botello, put a gun to his head, and told him to "get the F out of here." Botello was just standing there. Olivia ran up the street to the gunman, shoved him in the chest, and screamed at him. Cooper tried to restrain Olivia. People were running all over the yard. Olivia chased after the gunman as he went toward the house and Ross grabbed her. Cooper did not know what the gunman did with the gun and she didn't pay attention after he ran away.

Armas said that an Oldsmobile rolled up, and the doors opened. Although Armas saw no guns, the men in the car, whom she did not know, implied that they were armed by holding their hands at their waists, saying "What you gonna do?" Armas agreed with defense counsel's suggestions that the African-American males were "going up to" Botello, that they "actually got in Joey's face," as they previously had done inside the house, and that they had "their hands under their shirt."

Bonnett testified that an old four-door car like a Chrysler or Oldsmobile drove up and stopped in the middle of the street as Bonnett was on the sidewalk in front of the house. African-American males in their early twenties jumped out of the car. One approached Botello and pointed a gun at him from no more than five feet away. Botello,

who was across the street from the house and on the other side of the car, held up his hands and backed away. Words were exchanged, but Bonnett did not know what was said. However, Bonnett had told the grand jury that the African-Americans screamed something like, "What now?" when they put a gun to Botello's head After the exchange of words, the gun pointed at Botello was lowered. Bonnett tried to round up his friends and leave. He testified that he did not remember anyone approaching the gunman, but he had told the grand jury that Olivia was in the street, trying to break up the fight and calm things down. He also told the grand jury that the African-American males started to walk toward the house after the confrontation with Botello. They were walking away from Botello before Bonnett heard gunshots.

Villarreal said that an older, box-like car pulled up, and two or three African-American males jumped out. One or two of them waved a gun or guns and said, "You guys got to get up out of here." Botello was in the front yard.

Apodaca stated that an older car drove up and stopped in the middle of the street. Four or five people were in the car and African-American guys jumped out. Apodaca saw at least one gun and the men approached Botello with the gun as he was walking away, across the street from the house. Apodaca started to leave when he saw the gun, walking past the African-American men.

In his interview with police, Polries said that Botello lifted his shirt and said multiple times that he didn't have a gun when the gun was pointed at him.

### E. *Gunfire*

Pierce denied leaving the party or seeing the Oldsmobile belonging to one of his friends do so. The car was parked a couple of houses away where the court began to turn around and Pierce went to stand next to it. Cofield was sitting on the front lawn and he did not see her talking to anyone. A group of people were there and another group was down the street, toward the cross street. Pierce and Cofield started going back into the house and he was shot at the doorstep. He did not see a firearm and did not know who shot him. No one yelled anything and he heard no angry words. Pierce said that he

9

wouldn't say who shot him even if he knew. He told the police he was shot by mistake and that it didn't have anything to do with him.

In contrast to his testimony at trial, Pierce's earlier statement to the police was more detailed. He said that the same group of male Hispanics who had argued with someone earlier was coming up the street from Orleans Drive. One looked as if he was reaching for a gun near his waist. He was about five feet, seven inches tall, weighed 200 pounds, had a heavy build and black slicked-back hair, and was wearing a white Joe Montana jersey, number 16,[2] with the number and lettering in red. A second man, who might also have been reaching for a gun at his waist, was five feet, six inches tall, weighed 200 pounds, had shorter slicked back black hair, and was wearing a white T-shirt.[3] Pierce said he did not see a gun and was in the doorway of the house when he was shot.

Cofield testified that as she and Porter were about to walk back to the house, Botello and the people in the middle of the street began walking down the hill towards Orleans Drive. Turning toward the street, Cofield saw Botello reaching into the waist area of his pants. Botello was near the driveway, in the street behind a truck. His shirt came up, but she did not see a gun. Cofield was in the driveway near the walkway to the front door. She had already started to move away from there when many shots were fired, and everybody ran. She ran inside through the front door and went to a back part of the house. After someone told her that Porter had been shot, she went to the living room and saw him lying motionless on the floor, shot in the back of the head. She ran to the side of the house and found a gun on the ground next to the house and near the side gate. She did not know where the gun came from or who owned it. She threw it into a blue trash container next to the house.

Cooper was standing about five feet from Botello after the gunman had threatened him. Olivia had chased the gunman toward the house and Ross had grabbed Olivia

---

[2] In another statement to police, Pierce said the number was 14 or 16.

[3] In closing argument, counsel for Miles said this description also fit Santos and Burk.

Cooper turned and saw a man coming up the sidewalk from Orleans Drive to the corner of the yard. The man was wearing a black hoodie, and "crouching, creeping up." Although she told the police he was white, she testified that she could not tell what race he was. The man was facing the house and Cooper saw one flash or something from the area where the man was coming up the street. It was hard for her to tell if a gunshot corresponded to the flash. She was unsure what Botello did because her back was to him. Before the flash, he was near her, on the sidewalk behind her, and not near the driveway when shots were fired. She did not see him shoot and never saw him with a gun. She did not know Miles and did not see him that night. Cooper heard a few more shots, ran, and hid behind a car across the street from the house. Santos was behind the same car as she. She did not see anyone get shot and did not think the African-American who had threatened Botello shot at him, though she could not be sure. After the gunfire stopped, she ran to Armas's car and jumped into the back seat. Santos got in the car as well and Botello came running to the car and got in the front seat. Armas, with her passengers, left immediately.

Armas testified that she was standing at the left rear bumper of her car when she saw a flash and heard multiple gunshots. Botello and Cooper were in front of her car, across the street from the house. After testifying that the flash came from where Botello was standing, Armas agreed with defense counsel's suggestion that she was not sure from which direction the flash came. It sounded as if guns were fired from two different places—one from up the hill toward the end of the court and one from down the hill. The gunfire from the court was from where the Oldsmobile was parked, up the street. It seemed as if the gunfire was from people shooting at each other. Armas ducked where she was standing, behind her car. She did not see Botello with a gun. After the shots were fired, Armas was the first to get into her car. All four passengers who had come with her to the party—Botello, Burk, Cooper, and Santos—also got in. It took less than three or four minutes and she drove away fast. Armas was impeached with a statement she gave to the police on August 23. In the statement, she mentioned a gray or silver car

11

coming to the scene shortly before the shooting but didn't say anything about gunshots coming from the car.

Bonnett heard five or six gunshots, or more, about five seconds after he started to walk away toward the cross street. He was in front of the group he was with—Olivia, Ross, Apodaca, and Villarreal. All of them ran when shots were fired. The gunshots came from behind Bonnett, and he did not turn to see. He heard two different sounds, but did not know where the shots came from. He did not see Botello with a gun that night.

Villarreal estimated that 30 seconds to one minute passed from the time the car pulled up in front of the house to the time that he heard a couple of gunshots. They came from behind him as he was walking away from the house toward his vehicle with Apodaca. Villarreal was across the street just getting ready to go down the hill to his truck when he heard the gunshots. Villarreal started to run when he heard the gunshots and, drunk, he tripped and fell. He lay on the ground briefly, then rose and kept running after the gunfire stopped. He got in the driver's side while Apodaca and Olivia got in the other side.

Apodaca heard five or six gunshots coming from behind him as he walked down the street and was just about at Villarreal's truck on the corner. Apodaca ran to the truck and Villarreal was behind him. He did not see who fired. Apodaca testified that he did not see Botello with a gun, even though he had told the police that Botello had a gun. After testifying that he did not remember telling the police that Botello had a gun, he said it was because the police harassed him.

In his interview with police, Apodaca said that after the African-American men returned, the "Mexican guy," whom he identified later in the interview as Botello, was holding a gun that was "like a nine or 45." He said that both the African-American man and the Hispanic guy had guns. Earlier in his statement, Apodaca said the "dude" pulled out a gun and said, "that's disrespectful ass shit" after the African-American men jumped out of the car. Apparently continuing to refer to the "dude" who pulled out a gun, Apodaca next said: "And then . . . he . . . ran to . . . the car, was it a car or around . . . the corner? I don't know. This one dude ran and . . . he had come back and then he was just

12

talking to him and then I was like man, they're about to start fighting." Apodaca also said that the Hispanic man holding the gun "came from . . . nowhere."

In the interview, Apodaca said Botello was standing in the street by himself. Botello was holding a gun in his right hand, pointed down. The African-American males were near the house, about 20 feet from Botello. Apodaca did not see Botello point the gun at the house, nor did he see him shoot. After the interview, Apodaca identified Botello from a six-person photo lineup.

Olivia testified that she did not see a gun that night and did not see anyone point a gun at Botello. Her testimony was impeached with the videotape of an interview with the police conducted the morning of August 1. In the interview, Olivia said a chunky guy, whom she knew as JB, had a gun. He pointed the gun at the house, but she did not know if he fired it. After her interview, Olivia was shown a six-person photo lineup and she identified Botello as the person she saw standing in the street holding a gun pointed at 274 Zoe Court.

Salguera testified that he had parked his pickup truck on the corner of Orleans Drive. He heard about eight gunshots when he was at the corner, walking back to his truck with Miles, who was five feet from him. Salguera and Miles got in the truck when the shooting started and left. Salguera did not see the shooting and Miles did not go to the truck before the shooting. Salguera did not see Miles talking to Botello immediately before the gunshots. He did not see Miles walk back toward the house or see him with a gun. He did not see where Botello was at the time of the shooting. Botello did not come to Salguera's truck and Salguera did not see Botello running anywhere.

Salguera was impeached with his grand jury testimony. Before the grand jury, Salguera said that Botello came down the hill, short of Salguera's vehicle, and started speaking to Miles. Botello and Miles then went back up the hill towards the house. Salguera also told the grand jury that Miles ran down the hill, apparently holding a gun, and got into Salguera's truck, though he did not see where Miles was when the shots were fired.

13

Salguera was also impeached with his interview with the police that was played to the jury. In that interview, Salguera said that he was getting into his truck as Botello ran down the hill, called to Miles, and spoke with him. Salguera said that Botello and Miles grew up together, agreeing with the interviewer that they were pretty "tight." Botello and Miles then started walking up the hill. Less than five seconds later, when they were about two car lengths from him, Salguera heard a lot of gunshots, sounding like two different guns. Salguera thought they were shooting in the air; he saw no one get hit. Miles came running down the hill, carrying a gun, while Botello ran up the hill. Salguera did not see Botello with a gun. Salguera knew Miles was shooting, but did not think Botello was one of the shooters because Botello was close to Miles and the other gun sounded like an echo. Salguera drove Miles home and did not ask him about the shooting.

In his interview with police, Polries said he was at the corner of the garage when he turned to look, at which point he heard many gunshots. Polries ran to the side yard, into the backyard, and into the house. He heard bullets whizzing past him as he ran. Polries said he never saw a gun, and didn't see Botello shoot at the house. He also said that Botello was the only person facing the house and all the bullets went toward it. Polries didn't know if another person had a gun, but it sounded as if two guns were firing.

## F. *Miles and Botello Meet at Miles's House after the Shooting*

Armas testified that, following Botello's directions, she drove from the shooting to Miles's house in Hercules. Armas and Cooper stayed by the car, but everyone else got out and walked toward the house. She thought that Botello and Burk went inside. Armas thought she saw Miles at the party, but did not remember seeing him at the house in Hercules. Later in her testimony, Armas said Miles was already there when she arrived and that he, Botello, Burk, and Santos went inside. Botello and Burk came out of the house and Armas said that "we" got in the car and left. She drove to Cooper's home and dropped everyone off there.

Cooper did not remember where Armas drove from the party, but she drove "really crazy" and dropped off Cooper at Cooper's house without making any stops.

14

Salguera testified that he drove from the shooting to Miles's house, where he dropped off Miles and then left. Botello was already there, on the sidewalk and several people, whom Salguera did not know, were with him.

## G. *Injuries*

Porter was shot once, with a single bullet that went through him. It was not possible to determine what kind of bullet it was. The bullet entered one inch behind the right ear and exited on the upper forehead, just to the left of the mid-line. Accordingly, the bullet traveled from the back of the head toward the front and from right to left in an upward path. The absence of stippling showed that Porter was at least several feet away from the muzzle of the gun when it fired.

Pierce testified that he was shot in the leg. The bullet went all the way through. It took him about a week to recover.

## H. *Evidence from the Crime Scene*

The police found two groups of shell casings. One group of four .45 caliber casings was in the street near the driveway of 274 Zoe Court. A group of nine 9-millimeter casings was found on the street toward Orleans Drive. No latent fingerprints were recovered from any of the casings.

From a recycling bin at the side of the house, the police recovered a revolver. The gun had a five-shot cylinder. Four of the cylinders were loaded with live rounds and the fifth was empty. No latent fingerprints were recovered from the gun.

The police found an expended bullet in the backyard a few inches behind a fence on the side of the house that divided the front yard from the backyard. A drainpipe on the side of the house was freshly marked with an indentation near where the bullet was found. The garage door had two bullet holes in it. The front window of the house had a bullet hole in the lower left portion. There were blood stains on the front steps.

## I. *Other Statements*

Armas testified about two conversations with Cooper. The first was with Cooper and Olivia one or two days after the shooting. The second was with Cooper alone, before Armas spoke to the police. In the second conversation, according to Armas, Cooper told

15

her that she had spoken to the police and that she was going back to tell the police what she saw, to protect Botello because she saw the shooting, didn't think the situation was fair, and believed Botello was acting in self-defense. Cooper wanted Armas to go with her, but Armas decided not to.

Armas said that Cooper told her: (1) Botello had a gun; (2) someone passed him the gun; (3) Botello started shooting after he got the gun; (4) Botello started shooting in unison with other people; and (5) Botello passed the gun back to somebody. It is unclear from the record which of these alleged statements came in which of the two conversations.

Armas did not know where Cooper got the information that Botello passed the gun. She didn't see anyone pass anything to him or Botello pass anything back. Cooper testified that she never saw Botello with a gun, didn't think she told Armas that he had one, and didn't think she told Armas that someone passed a gun to him.

Armas also testified that she talked with Burk about the shooting in person and, soon afterward, on the phone. Before she spoke to Burk, Cooper had passed along the information described above, so it was in her mind that Botello was a shooter.

The phone call occurred when Armas called Burk's cell phone. Burk said he thought it was the other person, a second shooter, who shot the man who died. At this point, Burk put on the phone a person who said to her, "Don't put my name in anything; I was never there; you don't know me, and I just want to make that clear." Armas said she believed the person speaking to her was Miles because Burk told her so.

Pistello testified that Armas gave essentially the same account to him when he interviewed her. Although Armas did not remember Burk telling her on the phone who any shooter was, she believed from her conversations with him that Botello was the first shooter and Miles was the second. She also said that she didn't know if Burk meant that Botello or anyone else was shooting and she didn't remember the conversation.

**J.  *Searches***

Both Botello's and Miles's homes were searched by the police. Only the evidence obtained at Botello's home is relevant to this appeal.

16

Pistello testified that he served a search warrant at Botello's home on August 2, 2007  Botello was not there, but members of his family were.  The police recovered a red football jersey, from a back bedroom, with the number "16" painted in gold and outlined in white.  They also recovered a red shirt with the number "1" painted on the back in white, and a red article of clothing with a white paisley print.

From the basement, the police recovered a large piece of cardboard displaying a white cross with red and black borders.  Asked if this item was consistent with gang activity, the gang expert said, "it can go either way."

In the dust on a window of one of the vehicles parked in front of the residence, someone had written something like "J-Boy's whip" and "No scrap."  The "s" in "scrap" was crossed out.  A "whip" is a car.  No evidence was presented that the car belonged to Botello or that he had ever been known as, or referred to himself as, "J-Boy."

A police officer also looked at Cooper's cell phone.  A photo on it showed Botello making a gang sign:  a "1" with one hand and a "4" with the other.

## K. *MySpace Pages*

Pistello copied a number of messages from Botello's MySpace page.  Most of these messages carried the caption:  "My hood loves me, the cops hate me."

On August 16, in response to a message asking him how he was doing, Botello wrote:  "Okay, but I'm out of state.  They lookin' for me on some stupid shit, but I'm turning myself in in September."  Later that day, he wrote:  "I got to stay low.  You might have heard what happened, but they're looking for me for some shit that happened, so I'm staying low."  Messages late that afternoon and evening read:  "It's hearsay, but they think I did it because I got into it with somebody at the party, but they ain't got shit on me"; "Yeah, nigga, they trying to stick me for two 187"; and "Yeah, we do, cuz I might be gone for a long time."  "187" is the number of the murder statute in the Penal Code.

On August 17, Botello wrote:  "I don't know if you heard but, boy, I'm in Dodge City cuz these punk police are on my ass."  Later, in response to a message about "187 charges" against him, he wrote:  "One and the other attempted, but they ain't got shit on me, dis I'm trying to get this shit over with."

17

On August 21, he wrote: "I know you know where the functions are, but if there's scraps, I can't fuck with it, so let me know what's up?" On August 31 a message had the caption: "I'm dodging these muthafuckas like Barry Sanders."

A photo from Botello's MySpace page[4] showed Botello with his arm around Villarreal. Bonnett was in the photo, making a "1" and a "4" sign with his hands and wearing a red Chicago Bulls jersey.

## L. *Palmieri's Testimony about Gang Association*

Palmieri testified, as a gang expert, to his opinion that Miles was a member or affiliate of a Norteño street gang, as evidenced by various tattoos and items displayed on the door of Miles's bedroom.

Palmieri described an incident in April 2007 in which a Norteño and a Sureño were fighting and Botello intervened, attacking the Sureño who was involved. He believed that Botello acted with the intent to benefit the gang and assist another gang member in criminal activity.

A photo from Botello's MySpace page showed Botello wearing a baseball hat and football jersey and making the "dub sign," a hand sign associated with the "Squad Boys," a gang affiliated with the Norteños. The hand sign, however, is also a sign that the person displaying it wants to buy marijuana and Palmieri did not regard it as particularly associated with a Norteño gang. Another photo showed Botello with his arm around a person who was making a "1" as Botello was making a "4," and others were also making gang signs.

Also found on Botello's MySpace page was a cartoon character, wearing a red baseball cap with the letter "N" on it, urinating on the word "scraps." Such a display was consistent with being a Norteño member or affiliate.

Palmieri expressed his opinion that Botello was a Norteño gang member or affiliate. He based this opinion on "the totality of the evidence and circumstances, and police reports that [he had] read, and [his] training and experience."

---

[4] Pistello was not certain that it came from Botello's MySpace page. It may have come from another person's account.

18

After testifying about the importance in gang culture of showing strength, Palmieri said, in answer to a hypothetical question, that it would look weak for a gang member to get bumped into at a party without asking for an apology and without doing anything if the other person "escalates it." In answer to another hypothetical, Palmieri said it was consistent with gang activity for a gang member to get a gun from another gang member and open fire after having been threatened with a gun. He said it was indicative of gang activity to "immediately respond back with the proper amount of force, to gain your respect back . . . ." Brandishing a gun at a gang member would be "a huge disrespect of" him and would need to be answered, or the gang member would be considered weak, particularly if another gang member were present.

Palmieri testified that, in jail, Botello was housed with Norteños, separate from Sureños, but during cross examination, Palmieri admitted that he did not know Botello's current housing situation in jail.

## DISCUSSION

### I. *The Meaning of Miles Acquittal*

Before dealing with Botello's specific assertions of error, we address a fundamental mistake that Botello makes at different points. We will address the specifics as they arise, but briefly, Botello would have us factor the jury's acquittal of Miles into our evaluation of the sufficiency of the evidence, or conclusions about valid routes by which the jury could reach its determinations. These arguments amount to the proposition that we must adopt a rule of consistency—that our determinations concerning Botello must be consistent with Miles's acquittal.

In *People v. Palmer* (2001) 24 Cal.4th 856, 860 (*Palmer*), defendant Price argued "that, because it takes at least two to conspire, the verdict finding Palmer, his only alleged coconspirator, not guilty of conspiracy is inconsistent with his conviction for the same conspiracy." The court recognized that the conspiracy verdicts were indeed inconsistent, but held that both could be given effect, observing: "The law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely satisfying, consequence of a criminal justice system that gives defendants the benefit of a reasonable doubt as to

19

guilt, and juries the power to acquit whatever the evidence." (*Ibid.*) The *Palmer* court recognized the general rule " 'that acquittal of one codefendant normally will not require acquittal of another' " (*id.* at p. 861) and held that "Price's verdict must stand or fall on its own merit, not in comparison to Palmer's." (*Id.* at p. 865.) The court concluded: "Price does not claim that any of his jury's verdicts, including the conspiracy conviction, lacks evidentiary support. Accordingly, the Court of Appeal correctly affirmed the conspiracy conviction even though it is logically inconsistent with Palmer's acquittal of that conspiracy." (*Id.* at p. 866.)

The *Palmer* court noted that "[t]he United States Supreme Court has embraced this general rule [giving effect to inconsistent verdicts]. 'Inconsistency in a verdict is not a sufficient reason for setting it aside. We have so held with respect to inconsistency between verdicts on separate charges against one defendant, [citation], and also with respect to verdicts that treat codefendants in a joint trial inconsistently, [citation].' " (*Palmer*, *supra*, 24 Cal.4th at pp. 860, 961, quoting *Harris v. Rivera* (1981) 454 U.S. 339, 345, fns. omitted.)

Given clear guidance at both the state and federal level, we cannot accept Botello's arguments that a rule of consistency must apply. Botello's verdict must stand or fall on its own merit, not in comparison to Miles's.

## I. *Instructional Error*

Botello claims that the trial court prejudicially erred in instructing the jury by: (1) including an instruction on the right of occupants of a residence to use reasonable force to eject a trespasser (CALJIC No. 5.40); (2) providing misleading and incomplete instructions on self-defense and imperfect self-defense, even if CALJIC No. 5.40 was properly included; (3) failing to instruct the jury concerning mutual combat and the circumstances under which the original aggressor may claim self-defense; and (4) failing to instruct the jury on proximate causation.

## A. *Standard of Review and Applicable Law*

Article VI, section 13, of the California Constitution provides that a judgment cannot be set aside "unless, after an examination of the entire cause, including the

evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." We review the legal adequacy of an instruction independently. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.)

"[T]he trial court normally must, even in the absence of a request, instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case." (*People v. Carter* (2003) 30 Cal.4th 1166, 1219.) However, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).) Nonetheless, giving an irrelevant or inapplicable instruction is generally " ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

If we find that instructional error occurred, we may not reverse the judgment unless we also find that the defendant was prejudiced by the error. (See, e.g., *People v. Lee* (1987) 43 Cal.3d 666, 671.) If the error rises to constitutional dimension, amounting to a denial of the defendant's due process rights, we determine prejudice using the *Chapman* test: prejudice arises unless the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Otherwise, we determine prejudice using the *Watson* test: prejudice arises if it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

"With regard to criminal trials, 'not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is " 'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.' " ' " (*People v. Huggins* (2006) 38 Cal.4th 175, 192.) "In reviewing a claim of error in jury instructions in a criminal case, this court must first consider the jury instructions as a whole to determine whether error has been committed. [Citations.] We may not judge a single jury instruction in artificial isolation, but must view it in the context of the charge and the entire trial record." (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1330–1331; see also *Guiton*, *supra*, 4 Cal.4th at p. 1130 [in

examining the question of prejudice from instructional error, an appellate court should look to the entire record, including the evidence and arguments of counsel].)

## B. *CALJIC No. 5.40*

Botello first contends that the trial court erred by instructing the jury with CALJIC No. 5.40, over defense objection, because there was no factual basis for it. This instruction, as recited to the jury, provides: "The lawful owner or occupants of a residence or habitation on real property has the right to request that a trespasser leave the premises. If the trespasser does not do so within a reasonable time, the owner/occupants may use reasonable force to eject the trespasser. [¶] The amount of force that may be used to eject the trespasser is limited by what would appear to a reasonable person, under the existing circumstances, to be necessary to prevent damage to the property or physical injury or death to the homeowner, or occupant or guests."

"The principles set forth in CALCRIM No. 3475 [the CALCRIM analogue to CALJIC No. 5.40] . . . apply primarily to cases in which the *owner or occupant* of property is charged with using excessive force to remove a trespasser." (*People v. Johnson* (2009) 180 Cal.App.4th 702, 709.) These principles "might also apply when there is an issue of whether a trespasser had any right to defend himself against the use of force by the owner/occupant of the property. In general, if an owner/occupant lawfully uses force to defend himself against aggression by a trespasser, then the trespasser has *no* right of self-defense against the owner/occupant's use of force." (*Id.* at pp. 709-710.) This case presents a use of the instruction for the second noted application—if Botello were a trespasser then he would have no right of self-defense in response to reasonable attempts by an owner/occupant to eject him from the property.

### 1. *The Prosecutor's Arguments*

In rebuttal to defense counsel's closing argument for self-defense, the prosecutor told the jury: "But Botello was told to get out. Get out of the party. Initially he was told, Don't come to the party. And once he got there things went downhill and he was told to get out. Did he get out? No. [¶] The judge read an instruction that says the owner or occupant of a property has a right to use force to put somebody out. What's reasonable?

22

It doesn't seem to work to say, Joey, it looks like you're a little hot under the collar today. Maybe you ought to go home and get some sleep and tomorrow will be a brighter day. That kind of logic does not seem to work with Joey Botello. When Joey Botello sees a fight, he's in. . . . [¶] So, what do you do to throw Joey out? Sure, the obvious thing is you call the police and say, We're having a party, we're underage, we're drinking, and we have a guy here who's causing problems. Can you come and throw him out so we can get on with our drinking? That didn't happen. [¶] Yeah, they got guns. That was a mistake. That was wrong. Morally. None of us would advise that at all. Legally, yes, you can show Botello a gun, and they can show him and point it at him, and say, What now? What now? How tough are you now? Now get out. [¶] There is no evidence that a gun was fired, but the judge gave you an instruction that they can do that. They can use force. There's no evidence that anybody touched Joey. It was just, Get out, please. What does it take?"

The prosecutor then went on to argue against "heat of passion" mitigation to manslaughter because the time period between the confrontation of the African-Americans with Botello in the street and the shooting, which occurred when the African-Americans had reached the door of the house, provided sufficient time to cool off. The prosecutor also argued against a finding of self-defense, asserting that Botello acted from a motive of disrespect and not from fear and also that Botello was not in imminent danger at the time of the shooting because the African-Americans were no longer confronting him in the street but had reached the front porch of the house. He argued that the jury could not find self-defense because Botello had reached a place of safety by going after Miles to Salguera's truck and then came back with a gun. Similar considerations supported the prosecutor's arguments that the jury could not find imperfect self-defense, mitigating murder to manslaughter.

Following this, the prosecutor again called CALJIC No. 5.40 to his assistance: "[Botello] created the situation when he tried to start the fight and refused to leave the party. [¶] He was obligated to leave when asked. The judge read you an instruction that that is what the law is. They were entitled to throw Botello out of their party. It was their

house, and when they wanted him out, he was trespassing. And they were entitled to use force after Botello threatened violence to stay there. That's what the law is. Botello has to leave when they tell him to. Botello can't say I'm going to kick your ass and stay. That's illegal." Finally, the prosecutor told the jury: "Now, the facts proven are there was a conflict at the party and Botello threatened violence. Botello was ejected from the party in a disrespectful but legal manner. Botello was offended and he sought out Miles. Miles and Botello returned with firearms, they both opened fire, killing Porter and wounding Pierce."

## 2. *Lack of Evidence Supporting the Use of CALJIC No. 5.40*

Botello asserts that the instruction was given in error "because there was no evidence at the time of the confrontation between the African-Americans and Botello in front of the house Botello was on the property of 274 Zoe Court or that he attempted to forcibly enter the property. To the contrary, the evidence indicated that Botello was on a public street—Zoe Court at the time of that confrontation." "Furthermore, there was no evidence that at the time the African-Americans assaulted Botello with a firearm, Botello posed any threat to the property or the occupants of the property or their guests. Indeed, the people at the party, including Botello and his companions, were in the process of leaving the party when the confrontation in the street occurred."

The People make no effort to argue that the court's instruction of the jury with CALJIC No. 5.40 was supported by the facts of the case, choosing instead to focus on the question of prejudice. Their only words bearing on factual support are: "We do not concede the premise of appellant's argument—that the instruction was inapplicable because appellant had already left the premises when the men 'ejected' him. That point was subject to debate." Although Villarreal placed Botello in the driveway of 274 Zoe Court when the African-Americans confronted him with a gun, the clear weight of the evidence was that Botello was either in the street or on the sidewalk across the street, and was no longer on the property at 274 Zoe Court.

Whether or not one can debate Botello's proposed reasons why the instruction was unsupported by fact, we find a more fundamental reason. CALJIC No. 5.40 concerns the

24

right of the "lawful owner or occupants of a residence." The sole evidence we find in the record concerning the occupants of 274 Zoe Court is that it was the residence of Lamar and his father. We find no indication in the record that Lamar or his father attended the party, much less that they were involved in any action that could be interpreted as an expulsion of Botello for trespassing. Ladarian, Lamar's brother, was present at the party and may have been the person who pointed a gun at Botello, but Ladarian lived in Vacaville, not at 274 Zoe Court. Nothing in the record supports the inference that Ladarian, or anyone else, was acting as an agent for Lamar or his father.

Because the record does not support a conclusion that the lawful owner or occupants of 274 Zoe Court were involved in an attempt to expel Botello, it was error for the trial court to instruct the jury with CALJIC No. 5.40.

### 3. *Prejudice*

Botello argues that based on CALJIC No. 5.40 and the prosecutor's arguments, the jury might have assumed that the African-Americans who confronted Botello in the street and pointed a firearm at him were acting lawfully and that Botello had no right to defend himself or claim mitigation to manslaughter because he acted in the heat of passion. Botello claims that the error violated the due process guarantee that requires the prosecution to bear the burden of proving the absence of self-defense beyond a reasonable doubt. (See *People v. Martinez* (2003) 31 Cal.4th 673, 707.) He also claims that the error violated the due process guarantee that requires the prosecution in a murder or attempted murder prosecution to prove the absence of imperfect self-defense and heat of passion beyond a reasonable doubt. (See *Mullaney v. Wilbur* (1975) 421 U.S. 684, 703-704; *People v. Rios* (2000) 23 Cal.4th 450, 460, 462.)

Here the jury was instructed with two alternative routes by which they could find that the homicide was not justified: (1) by finding that the People had proven the absence, beyond a reasonable doubt, of one of the elements of self-defense or (2) by finding that Botello had no right of self-defense because he reacted to lawful measures

25

taken to expel him from property.[5]  The first route was supported by substantial evidence (Botello does not argue otherwise) and the second route was not.  This is the type of situation addressed by the California Supreme Court in *Guiton*.

The defendant in *Guiton* had been charged and convicted of selling or transporting cocaine.  (*Guiton*, *supra*, 4 Cal.4th at p. 1120.)  The Court of Appeal observed that the jury was instructed that it could convict the defendant on either of two grounds—that he sold *or* transported the cocaine—and there was insufficient evidence to support a finding that he sold cocaine.  (*Ibid*.)  Because it could not determine from the record whether the jury verdict rested on the valid ground of transporting cocaine or the invalid ground of selling cocaine, the Court of Appeal reversed.  (*Ibid.*)

The *Guiton* court examined and discussed *Griffin v. United States* (1991) 502 U.S. 46 (*Griffin*).  (*Guiton*, *supra*, 4 Cal.4th at pp. 1123-1126.)  In *Griffin*, the defendant had been charged with a conspiracy having two objects, with sufficient evidence to connect the defendant to one, but not to the other.  (*Guiton*, at p. 1123.)  The jury was instructed that it could return a guilty verdict if it found the defendant to have participated in either one of the two objects.  (*Ibid.*)  "The *Griffin* court . . . drew a distinction between a mistake about the law, which is subject to the rule generally requiring reversal, and a mistake concerning the weight or the factual import of the evidence, which does not require reversal when another valid basis for conviction exists."  (*Id.* at p. 1125.)  The *Guiton* court noted *Griffin*'s reasoning:  " 'Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime.  When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.  Quite the opposite is

---

[5]  Similar alternatives are presented for routes by which the jury could conclude that imperfect self-defense or acting in heat of passion did not apply to mitigate murder to voluntary manslaughter.  Our analysis would be the same and we do not further explore Botello's claim of prejudice as it relates to imperfect self-defense or acting in the heat of passion.

26

true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence [citation].' " (*Guiton*, at p. 1125, quoting *Griffin*, at p. 59.) The *Guiton* court agreed with this reasoning (*Id.* at p. 1126) and observed: "In analyzing the prejudicial effect of error, . . . an appellate court does not *assume* an unreasonable jury. Such an assumption would make it virtually impossible to ever find error harmless. An appellate court necessarily operates on the assumption that the jury has acted reasonably, unless the record indicates otherwise." (*Id.* at p. 1127.)

In considering the standard of review when the jury has been presented with a factually inadequate theory, the *Guiton* court noted that *Griffin*, though stating that ' "it would generally be preferable' to remove an unsupported theory from the jury's consideration, [did] not suggest that the failure to do so would violate the federal Constitution." (*Guiton*, *supra*, 4 Cal.4th at pp. 1129-1130, quoting *Griffin*, *supra*, 502 U.S. at p. 60.) "The error is therefore one of state law subject to the traditional *Watson* test . . . ." (*Guiton*, at p. 1130.)

*Guiton* imposed the following test for cases in which a jury had been presented with a factually inadequate theory of conviction: "the appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Guiton*, *supra*, 4 Cal.4th at p. 1130.) *Guiton* did not find that reversal is never appropriate and hypothesized that in "a case in which the district attorney stressed only the invalid ground in the jury argument, and the jury asked the court questions during deliberations directed solely to the invalid ground" it might well find prejudice. (*Id.* at p. 1129.)

Although the factually adequate and factually inadequate theories in *Guiton* involved the actual charge made against the defendant and the theories here relate to the affirmative defense of self-defense, we find nothing in the reasoning of *Guiton* that would lead us to distinguish Botello's case on that basis. Accordingly, we presume that the jury acted reasonably and rejected the factually inadequate theory presented by CALJIC No.

27

5.40 and the prosecutor's arguments, unless we find affirmative indications in the record that they did not. We find no such affirmative indications.

Even though Botello was told to leave by Cofield and, perhaps, one of the African-Americans who confronted him with a firearm, there was no reason for the jury to conclude that these individuals were residents or occupants of the property or that Botello was accosted with a firearm in an attempt to expel him from the property, rather than as an escalation of a personal argument. Further, the clear weight of the evidence was that Botello was in the street, or on the sidewalk across the street, and not on the property at the time. Finally, a reasonable jury would, as we do, find it astonishing that the prosecutor argued that it was reasonable for the African-Americans to accost Botello with a firearm because of a verbal argument that, as yet, had no physical expression. A reasonable jury would reject this argument out of hand.

The *Guiton* court presented a hypothetical case in which instruction on a factually inadequate theory might require reversal. In that hypothetical, the prosecutor stresses only the invalid theory in his or her jury argument. Here, the prosecutor presented the invalid theory, but also argued directly against a finding of self-defense. In the hypothetical, the jury, during deliberations, presents questions to the court directed solely to the invalid theory. Here, the jury presented no such questions.[6]

---

[6] During deliberations, the jury requested playback of the recorded interviews with Olivia, Salguera, Villarreal, Polries and Apodaca. They also requested a copy of "The 14 Bonds," which had been presented in evidence against Miles. The only other communications concerned an error on the verdict form, leading to the provision of corrected forms.

Botello does argue that these jury requests, and the lengthy jury deliberations, established this as a "close case," lowering the threshold at which we might find prejudice. (*People v. Wagner* (1975) 13 Cal.3d 612, 621, superseded by constitutional amendment on other grounds, as stated in *People v. Lankford* (1989) 210 Cal.App.3d 227, 235-236.) However, these jury requests were not directed solely to the invalid theory. Neither can the length of deliberations provide an affirmative indication that the jury relied on the invalid theory, because Miles was also on trial and there were multiple counts and sentencing allegations to consider.

Because we find no affirmative indication in the record that the jury based its conviction of Botello on the factually invalid theory presented by CALJIC No. 5.40 and the prosecutor's argument, we conclude that Botello was not prejudiced by the error of instructing the jury with CALJIC No. 5.40.

## C. *CALJIC No. 5.40 in Conjunction with Other Instructions*

The jury was instructed with CALJIC No. 5.17, which, in relevant part, as rendered to the jury, provides: "However, this principle [of imperfect self-defense] is not available, and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force, attack or pursuit." Botello contends that even if the jury was properly instructed with CALJIC No. 5.40, the jury instructions on self-defense and imperfect self-defense became prejudicially incomplete and misleading because they did not include the principle that "[w]here the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force." (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012), Defenses, § 80, p. 522.)

Here, the only theory of legal justification that was presented to the jury was that provided by CALJIC No. 5.40. We determined above that the jury, acting reasonably, rejected this theory, no affirmative indications pointing to a contrary conclusion. Thus, we must also conclude that the jury found no application for the quoted portion of CALJIC No. 5.17.

Botello also complains that the terms "unlawful or wrongful conduct" and "legally justified" were not defined for the jury and that "[w]ithout a proper explanation of these phrases, the jurors could have understood the instructions to mean that the African-American men were legally justified in assaulting Botello with a firearm merely because Botello came uninvited to the party, became involved in a verbal confrontation with a person at the party, and challenged that person to fight." All of this is mere speculation.

The jurors were instructed with CALJIC No. 1.00, which directed them to follow the instructions as to the law. We presume that the jury followed this instruction. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.) If, then, the jurors were faced with the

29

question whether an action were legally justified, that would clearly be a question of law, to be answered from the instructions given them. Because Botello points to nothing in the instructions, beyond CALJIC No. 5.40, that would have supported his speculations about the jury's conclusions, we reject Botello's assertion of error.

## D. *Mutual Combat*

Botello claims that the trial court prejudicially erred by failing to instruct on mutual combat, and that even an original aggressor may still claim self-defense if he attempts to withdraw or if he uses less than deadly force and his adversary responds with deadly force. Because a trial court has a sua sponte duty to instruct on the general principles of law relevant to the issues raised by the evidence (*People v. St. Martin* (1970) 1 Cal.3d 524, 531; *People v. Aranda* (2012) 55 Cal.4th 342, 354), he argues that the court should have instructed the jury with CALCRIM No. 3471 ("Right to Self-Defense: Mutual Combat or Initial Aggressor") or CALJIC Nos. 5.54 and 5.56, which present similar legal principles. Botello argues that he was prejudiced by this instructional omission because the jurors could have reasonably concluded that Botello was the original "aggressor" in a mutual combat situation by coming uninvited to the party and challenging one of the African-Americans at the party to a fight. If they did so, the jurors had no instructions to guide them on this issue.

CALCRIM No. 3471 begins: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if . . . ." CALJIC No. 5.54 begins: "The right of self-defense is only available to a person who initiated an assault . . . ." CALJIC No. 5.56 begins: "The right of self-defense is only available to a person who engages in mutual combat: [¶] [[1.] If [he] [she] has done all of the following . . . ."

We discern no error in the trial court's omission of an instruction on mutual combat. Although Botello challenged an African-American at the party to an unarmed fight, no fight actually ensued at that time. Thus, none of the proposed instructions applies to the facts of the case and it would have been error to include such an instruction.

We also see no basis for believing that a reasonable jury would fail to find that Botello had a right of self-defense at the time he was accosted in the street with a firearm.

30

Having concluded that Botello followed that event by firing a handgun, the question before the jury was whether he fired in self-defense, not whether he had a right of self-defense. Even if the jury believed that Botello, with his challenge to fight, started the chain of events that led to his being confronted with a firearm, Botello points to nothing in the instructions, or in the prosecutor's arguments (with the exception of those based on CALJIC No. 5.40, discussed above), that would lead the jury to conclude that Botello thereby lost his right to self-defense. The addition of these instructions, rather than helping Botello, could have prejudiced his case by raising the issue with the jury of whether Botello actually had a right of self-defense.

## E. *Proximate Causation*

Botello's final assertion of instructional error is that the trial court failed to instruct the jury with the standard jury instructions on proximate causation. Specifically, Botello maintains that the trial court should have instructed according to CALJIC No. 3.40, 3.41 and 8.55, or their CALCRIM counterparts.

CALJIC No. 8.55 provides: "To constitute [murder] [or] [manslaughter] there must be, in addition to the death of a human being, an unlawful act which was a cause of that death." The use note for this instruction specifies: " 'Cause,' defined in CALJIC 3.40, must be given. If there are 'concurrent causes,' CALJIC 3.41 must be given. [¶] Where cause is an issue, this instruction thereon must be given sua sponte." (CALJIC No. 8.55, Use Note [citing *People v. Bernhardt* (1963) 222 Cal.App.2d 567, 591].)

CALJIC No. 3.40 provides: "[To constitute the crime of _____ there must be in addition to the (result of the crime) _____ an unlawful [act] [or] [omission] which was a cause of that (result of the crime) _____.] [¶] The criminal law has its own particular way of defining cause. A cause of the (result of the crime) _____ is an [act] [or] [omission] that sets in motion a chain of events that produces as a direct, natural and probable consequence of the [act] [or] [omission] the (result of the crime) _____ and without which the (result of the crime) _____ would not occur." The Use Note for CALJIC No. 3.40 provides: "CALJIC 3.40 should be given where the evidence places in issue only one cause of the result of the crime. If the jury

31

must determine the issue of whether the defendant's act was the cause of the crime, CALJIC 3.40 must be given sua sponte. [Citation.] [¶] Where more than one cause is placed in issue by the evidence, CALJIC 3.41 should also be given." (CALJIC No. 3.40, Use Note.)

CALJIC No. 3.41 provides: "There may be more than one cause of the (result of the crime) _____. When the conduct of two or more persons contributes concurrently as a cause of the (result of the crime) _____, the conduct of each is a cause of the (result of the crime) _____ if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of the (result of the crime) _____ and acted with another cause to produce the (result of the crime) _____. [¶] [If you find that the defendant's conduct was a cause of (injury, death, etc.) _____ to another person, then it is no defense that the conduct of some other person [, even the [injured] [deceased] person,] contributed to the (injury, death, etc.) _____.]" The Use Note provides: "CALJIC 3.41 should be given where the evidence places in issue two or more causes of the result of the crime. [¶] Where cause is in issue, the court must instruct sua sponte on that subject." (CALJIC No. 3.41, Use Note.)

In *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*), Bland and another man shot at a car, killing the driver, and the evidence did not clearly establish who had fired the fatal shot. (*Id*. at p. 318.) The court determined that "the trial court should have given an instruction like CALJIC No. 3.40 and, because the evidence suggested more than one cause, No. 3.41 (today CALJIC No. 17.19.5, augmented, when the evidence suggests more than one cause, by CALJIC No. 3.41)."[7]

---

[7] At the time of Bland's trial, CALJIC No. 17.19.5, the standard instruction for a section 12022.53, subdivision (d) enhancement, did not exist. (*Bland*, *supra*, 28 Cal.4th at p. 335.) The proximate causation issue in *Bland* arose because section 12022.53, subdivision (d), which we discuss further below, requires that the defendant "proximately caused" great bodily injury or death, and none of the instructions given at Bland's trial defined proximate causation. (*Bland*, at pp. 333-334.)

32

In the case at hand, the evidence showed that two shooters fired toward the house at 274 Zoe Court, one firing a 45-caliber firearm and the other firing a 9-millimeter firearm.  Based on the position of the shells, the prosecution argued that Botello had fired the 45-caliber firearm and that the 9-millimeter firearm fired the shots that killed Porter and wounded Pierce, but the evidence did not clearly establish this.  Because of this parallel with *Bland*, we conclude that, as in *Bland*, the trial court should, at the very least, have augmented the CALJIC No. 17.19.5 instruction, which it did give, with CALJIC No. 3.41.  There was instructional error on the part of the trial court, so the question is whether that error prejudiced Botello.

Botello claims that failure to instruct on proximate cause was prejudicial because "[h]ad the jurors been instructed on proximate causation, they reasonably could have acquitted Botello of the murder and attempted murder charges inasmuch as there was evidence that another person fired the fatal and wounding shots."  For the jury to have arrived at such an acquittal, it would have had to reject the prosecution's theory that Botello had aided and abetted, and/or conspired with, Miles, who was the shooter who killed Porter and wounded Pierce.  Botello claims that they must have done so: "Considering the fact the jury rejected the prosecutor's case that Miles was involved in the shooting, and there is no evidence of Botello's conspiracy with another person or of his aiding and abetting of another person, Botello may not be criminally held responsible based on a vicarious theory.  The prosecutor never argued to the jury that Botello conspired with anyone else other than Miles or that he aided and abetted anyone else's shooting."

Botello's claim of prejudice fails, first because here he makes his first argument that we must impose a rule of consistency, which, as we explained above, has been rejected in both federal and California courts.  We cannot conclude, because Miles was acquitted, that the jury failed to find Botello guilty on a conspiracy or aiding/abetting theory.  Botello does not dispute that, had Miles been found guilty, substantial evidence would support his own conviction.  That Miles was acquitted does not change the fact that Botello's conviction was supported by substantial evidence.

33

The second reason Botello's claim of prejudice fails is that proper instruction on proximate causation typically tends to work against defendants, not for them. Finding that, despite the instructional error, there had been no prejudice, the *Bland* court explained that jurors hearing the term "proximate cause" " 'may misunderstand its meaning or improperly *limit* their discussion of what constitutes a cause in fact.' [Citation.] However, jurors who improperly *limit* their discussion of what constitutes proximate cause will not find causation where it does not exist. The correct definition of proximate causation is *broader,* not narrower, than jurors might assume." (*Bland*, *supra*, 28 Cal.4th at p. 338.)

Botello's claim of prejudice fails for a third reason—it is legally flawed, even if we were to accept a rule of consistency. The argument seems to be that if we reject a finding of vicarious liability because Miles was acquitted, then "based on the evidence and the prosecutor's argument, a properly instructed jury reasonably could conclude the prosecutor failed to prove beyond a reasonable doubt that the bullets which struck the victims were fired by Botello." This argument makes an invalid legal assumption because the prosecutor was *not* required to prove beyond a reasonable doubt that Botello fired the bullets that struck the victims in the absence of vicarious liability. (See, e.g., *People v. Sanchez* (2001) 26 Cal.4th 834, 848-849 [the jury could find that both gunmen proximately caused a death when two persons engaged in a gun battle, killing a bystander, but it was unknown who fired the fatal shot].)

The *Bland* court concluded that "[o]n the facts of this case, the jury could not have misunderstood the term 'proximate cause' in a way that would have prejudiced defendant, i.e., that would have resulted in a finding of proximate causation on an improper basis." (*Bland*, *supra*, 28 Cal.4th at p. 338.) They also concluded that the instructional error was "harmless under any standard." (*Ibid.*) Botello has not explained how the facts of his own case would compel us to reach a different result. We conclude that, although trial court erred by failing to fully instruct the jury on proximate causation, Botello was not prejudiced by the omission under any standard.

## II. *Ineffective Assistance of Counsel*

Botello claims that reversal is required because his counsel at trial rendered ineffective assistance by failing to ensure that the jury was properly instructed on the principles of law governing self-defense and proximate causation. Because a claim of ineffective assistance of counsel requires a showing of prejudice (*In re Thomas* (2006) 37 Cal.4th 1249, 1256), we need not examine this claim because we have already determined that Botello was not prejudiced by the instructional errors discussed above, the last two of which are the basis for his claim of ineffective assistance.

## III. *Evidence of Another Crime or Bad Act*

Prior to trial, an Evidence Code section 402 hearing was held with Palmieri, the prosecution gang expert. Palmieri testified at the hearing about an incident at Sunny Side Market, in San Pablo, on April 30, 2007. In that incident, which gave rise to charges against Botello that had been severed prior to trial, Botello allegedly intervened in a fight, defended a member of the Norteño gang, and assaulted a Sureño gang member, who had attacked the Norteño, with a deadly weapon. Following the hearing, defense counsel objected on Evidence Code section 352 grounds to any testimony regarding the April 30 incident as more prejudicial than probative. After discussion, it was agreed that Palmieri could testify about the April 2007 incident, in the limited way he had testified at the preliminary hearing, for the purpose of showing Botello's association with a gang.[8]

During Palmieri's testimony at trial, the prosecutor asked, "Now, did you investigate a case in the spring, I believe April of 2007, or did you become aware of a case in San Pablo in which a Norteño and a Sureño were fighting, and Joey Botello intervened on behalf of the Norteño and attacked the Sureño that was involved?" Palmieri answered, "Yes." Palmieri was then asked, "Did you form an opinion that that was gang related, without going into any more detail regarding the crime?" Palmieri

---

[8] The People contend that, by agreeing to this testimony, Botello has waived the issue on appeal. Botello counters that at the point of agreement, it would have been futile to reraise the objection. We need not resolve this dispute because we find no error by the trial court in admitting Palmieri's testimony.

35

answered, "Yes," and the prosecutor asked, "And did you form an opinion that it was done . . . with the specific intent to benefit the gang and assist another gang member in criminal activity?" Palmieri again answered, "Yes."

In closing argument, the prosecutor reminded the jury of Palmieri's testimony about the incident in question and told the jury that they could consider the incident for the purpose of showing that Botello was an active participant in the gang. Defense counsel also mentioned the incident in arguing to the jury that "[a]t best Mr. Botello is a wannabe."

Botello claims that the trial court erred in allowing Palmieri to testify about the April 30 incident and that this prejudiced Botello's case because it allowed the jury to learn about a prior crime or bad act. We review the trial court's decision for abuse of discretion and will find error only if the prejudicial effect of the evidence clearly outweighs its probative value. (*People v. Karis* (1988) 46 Cal.3d 612, 637.) However, the California Supreme Court has stressed that "evidence of uncharged misconduct ' "is so prejudicial that its admission requires extremely careful analysis." ' " (*People v. Lewis* (2001) 25 Cal.4th 610, 637.) "Since 'substantial prejudicial effect [is] inherent in [such] evidence,' uncharged offenses are admissible only if they have substantial probative value. If there is any doubt, the evidence should be excluded." (*People v. Thompson* (1980) 27 Cal.3d 303, 318, fn. omitted, superseded by statute on other grounds as stated in *Clark v. Brown* (9th Cir. 2006) 442 F.3d 708, 714, fn. 2.)

According to Botello, evidence of the April 2007 incident had little probative value because the prosecutor had ample evidence, apart from this incident, to establish his gang membership or association, including the testimony of some of the witnesses who attended the party on Zoe Court, the clothing and other items found in Botello's residence, the photographs depicting Botello throwing gang signs, the entries on Botello's "MySpace" page, and the fact that Botello was housed in jail together with Norteños and away from Sureños. None of this evidence, however, in part or in whole, clearly established Botello's gang membership and could have been consistent with a gang "wannabe," a conclusion that Botello's counsel repeatedly attempted to make as the

36

evidence was presented at trial. In contrast, the April incident explicitly demonstrated Botello's association with Norteño gang members and provided a stronger indication that Botello was actually a gang member.

Palmieri's testimony was not, as Botello contends, cumulative and unnecessary. It had substantial probative value because without it, the jury could easily have had substantial doubt that Botello was actually associated with the Norteños. We conclude that it was not error for the trial court to admit the evidence in question for the purpose of establishing gang association.

## IV. *Cumulative Prejudice*

Botello argues that even if the alleged errors discussed above were insufficiently prejudicial for this court to reverse the trial court, their cumulative effect combined to establish the prejudice required for reversal. In doing so, Botello simply repeats his individual claims and provides no reason for us to conclude that the doctrine of cumulative error might apply.

In considering the alleged errors previously discussed, we found only two errors, neither of which prejudiced Botello's case. We see no more prejudice in their combination, than when considered separately.

## V. *The Gang Allegations*

The jury found that the murder, attempted murder and shooting at an inhabited dwelling were committed "for the benefit of, at the direction of, or in association with" a criminal street gang, "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) The jury also found true the section 12022.53, subdivision (e)(1), allegations attached to the murder and attempted murder counts, which required a finding that Botello violated section 186.22, subdivision (b). (§ 12022.53, subd. (e)(1)(A).) Botello contends that these true findings must be reversed because there was insufficient evidence to support them.

"The substantial evidence standard of review applies to section 186.22 gang enhancements." (*People v. Augborne* (2002) 104 Cal.App.4th 362, 371.) Substantial evidence is " 'evidence that is reasonable, credible, and of solid value—from which a

reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*In re Alexander L.* (2007) 149 Cal.App.4th 605, 614.)

Botello asserts that insufficient evidence established a specific intent to promote, further, or assist criminal conduct by gang members. This is the second of Botello's arguments that erroneously invokes a rule of consistency, insisting that because of Miles's acquittal, we must, in evaluating sufficiency of the evidence against Botello, discount the evidence of Miles's involvement: "Here, although there is evidence that in addition to Botello there was at least one other shooter during the incident, it is completely unknown who the shooter or shooters were or whether they were gang members or associates. This court must not speculate that the other shooter or shooters had any gang connection." The argument fails for the same reason that it failed above—Botello's "verdict must stand or fall on its own merit, not in comparison to" Miles's. (*Palmer*, *supra*, 24 Cal.4th at p. 865.)

Botello does not dispute that substantial evidence was presented that Miles was a gang member or affiliate. Substantial evidence also supported the conclusion that Miles was the second shooter. Salguera told the police that Botello spoke with Miles immediately before the shooting and that both of them walked up the hill. Only a few seconds later, when Botello and Miles were about two car lengths from him, Salguera heard gunshots that sounded like two different guns. Miles then came running back to Salguera's truck carrying a gun. This account was consistent with Apodaca's statement to police, in which he said: "And then . . . he . . . ran to . . . the car, was it a car or around . . . the corner? I don't know. This one dude ran and . . . he had come back . . . ." The evidence that both Botello and Miles were driven separately to Miles's house immediately after the shooting, and that Botello went into the house, also supports a conclusion that Miles was the second shooter.

Because substantial evidence supported a conclusion that both Botello and Miles were shooters, substantial evidence supported the "in association with" prong of the gang enhancements. (See *People v. Albillar* (2010) 51 Cal.4th 47, 60-61 [by committing crimes together, gang members act in association with the gang because they increase

their status, further the gang's interest in intimidation, strengthen bonds within the gang, and deter disclosure by fellow gang members].)  Substantial evidence also supported the specific intent prong of the gang enhancements because "[c]ommission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime."  (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.)

## VI.  *The Section 12022.53, subdivision (d), Allegations*

The jury found true the section 12022.53, subdivision (d), allegations attached to the murder and attempted murder charges.  Section 12022.53, subdivision (d), provides: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a) [which includes murder and attempted murder] . . . , personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

Botello argues that because there was no evidence that he personally fired the bullets that killed Porter and wounded Pierce, there was insufficient evidence that Botello proximately caused Porter's death and Pierce's injury, given that the jury acquitted Miles on the murder and attempted murder charges.  Botello makes the same mistake here that he has made elsewhere—a mistaken reliance on a rule of consistency.

As in the preceding section, the prosecution presented substantial evidence that Botello and Miles were the two shooters and that the shooting happened within five seconds after Botello approached and talked with Miles near Salguera's truck.  A jury could reasonably conclude that because Botello approached Miles, it was Botello who instigated the shooting by both of them, and that therefore Botello proximately caused Porter's death and Pierce's injury, regardless of who fired the actual fatal and wounding shots.

**VII.** *The 10-Year Consecutive Sentence for the Gang Enhancement*

The trial court imposed a sentence on Botello consisting of 15 years to life for second degree murder, a consecutive 25-year to life personal firearm discharge enhancement under section 12022.53, subdivision (d), and a consecutive 10-year gang enhancement under section 186.22, subdivision (b)(1). Botello contends that the consecutive sentence of 10 years for the gang enhancement is invalid.

Section 186.22, subdivision (b)(1), provides: "Except as provided in paragraphs (4) and (5), any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows: [¶] . . . [¶] (C) If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years."

Section 186.22, subdivision (b)(5), provides: "Except as provided in paragraph (4), any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."

In *People v. Lopez* (2005) 34 Cal.4th 1002, the court held that where a violent felony carries a term of years to life, and not just a "straight" life term, the minimum sentence of section 186.22, subdivision (b)(5) applies and not the sentence of an additional term of 10 years imposed by section 186.22, subdivision (b)(1)(C). (*Lopez*, at pp. 1006-1007.) The People do not dispute Botello's claim that, under *Lopez*, it was invalid for the trial court to impose a consecutive 10-year term under section 186.22, subdivision (b)(1)(C). We agree.

The parties differ in the disposition they request. Botello asks us to strike the 10-year term imposed under section 186.22, subdivision (b)(1)(C), and order the trial court to amend both the sentencing minutes and the abstract of judgment to reflect the striking of the enhancement. The People argue that the trial court had sentencing options it did

40

not take, based on the sentencing options that it did impose, and that if part of the sentence it imposed is invalid, we should remand to the trial court for a resentencing hearing. For instance, if the court had not believed it had the option of a 10-year consecutive sentence under section 186.22, subdivision (b)(1)(C), the court might have imposed a consecutive sentence rather than a concurrent sentence for the attempted murder. Alternatively, the court might have imposed a consecutive sentence for shooting at an occupied building, rather than staying that sentence.

Botello complains that the People cite no authority for their request for a resentencing hearing, but courts of appeal routinely reverse a sentence and remand for resentencing when sentencing errors occur. (See, e.g., *People v. Campos* (2011) 196 Cal.App.4th 438, 455.) Botello cites two cases in which the court of appeals simply struck an erroneous 10-year sentence under section 186.22, subdivision (b)(1)(C), ordering instead that the abstract of judgment be modified to reflect the imposition of the minimum sentence under section 186.22, subdivision (b)(5). (*People v. Fiu* (2008) 165 Cal.App.4th 360, 400; *People v. Harper* (2003) 109 Cal.App.4th 520, 527.) However, in neither of these cases is there an indication that the People requested resentencing as an alternative.

During sentencing the trial court made clear that instead of imposing a concurrent sentence for the attempted murder, it could have imposed a consecutive sentence. We will not second guess what decisions the trial court might have made in the absence of its sentencing error. Accordingly, we reverse Botello's sentence and remand to the trial court for resentencing.

## VIII. *The Restitution and Parole Revocation Fines*

The trial court imposed on Botello a restitution fine of $100,000 and a parole revocation restitution fine in the same amount. Botello contends that these fines must be reduced to $10,000, the statutory limit for such fines. The People agree.

Section 1202.4, subdivision (b)(1), sets the upper limit for a restitution fine at $10,000. Section 1202.45 requires a parole revocation restitution fine in the same

41

amount as the restitution fine.  Accordingly, at resentencing, the trial court must respect the statutory limit.

## IX. *The Probation Officer's Report Fee*

At sentencing, the trial court, pursuant to section 1203.1b, ordered Botello to pay a probation report fee of $176.  Botello asserts that this fee must be rescinded because the court ordered the fee without a determination of Botello's ability to pay it, as required by section 1203.1b, subdivision (a).  The People do not contest the merits of Botello's claim, but urge that he forfeited this issue on appeal by failing to object at sentencing.  We need not address the forfeiture issue because we have already determined to reverse Botello's sentence and remand for a resentencing hearing, at which the requirements of section 1203.1b can be met.

## DISPOSITION

We reverse Botello's sentence and remand for a resentencing hearing, in accordance with this opinion.  The judgment is affirmed in all other respects.

_____

Lambden, J.

We concur:

_____

Haerle, Acting P.J.

_____

Richman, J.